1

2

3

4

5

Ryan T. Earl
EARL LAW GROUP, PLLC
1334 S. Pioneer Way
Moses Lake, WA 98837
Telephone: 509-765-1705
Fax: 719-269-8832
ISB# 8342 WSBA# 34007 CO#45910
enepllc@gmail.com

6

7

IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF WASHINGTON

8

9

10

11

12

13

| | |
|---|---|
| WAYNE R. BLACK,<br><br>                    Plaintiff,<br><br>                    vs.<br><br>GRANT COUNTY PUBLIC UTILITY DISTRICT, a Statutory Nonprofit Corporation; Chris Heimbigner, as a Superintendent of Grant County Public Utility District.<br><br>                    Defendants. | **DEMAND FOR JURY TRIAL**<br><br>Case No:   2:17-cv-365<br><br>COMPLAINT |

14

15

16

COMES NOW Plaintiff, Wayne R Black, by and through his attorney, Ryan T. Earl, of the firm Earl Law Group, PLLC, and respectfully complains as follows:

## I.  PARTIES

17

18

19

1. Plaintiff Wayne R. Black (hereinafter Plaintiff Black) is a 59 year-old citizen of the State of Washington and a resident of Grant County Washington and a member of the Church of Jesus Christ of Latter-Day Saints, more commonly known as Mormons or LDS (hereinafter Mormon), at all relevant times.

20

21

2. Defendant Chris Heimbigner is a citizen of the State of Washington and is the Line Crew Superintendent of Grant County Public Utility District.

22

23

24

3. Defendant Grant County Public Utility District is a Statutory Nonprofit Corporation, that must comply with state regulations for municipal corporations, operating in the State of Washington providing power and services to Grant County, with their headquarters located at 30 C St SW, Ephrata, WA 98823 at all relevant times.

## II. JURISDICTION AND VENUE

4. This action arises under the Constitution and laws of the United States including 28 U.S.C. 1331and and 42 U.S.C. 200e.

5. The proper venue for this action is in the Eastern District of Washington pursuant to 28 U.S.C. §1391(b)(1) as all Defendants reside in which the district is located.

## III. GENERAL ALLEGATIONS

### Notice of Claim Pursuant To Revised Code of Washington (RCW) 4.92.100 And Right To Sue Letter

6. Plaintiff Black incorporates herein by reference relevant jurisdiction and venue allegations set forth with specificity in all preceding paragraphs of this civil Complaint as if set forth verbatim.

7. On March 31, 2017, Plaintiff Black sent a Notice of Claim for Damages against Grant County PUD pursuant to RCW 4.92.100 certified return receipt to Grant County PUD. Grant County PUD received the letter on April 4, 2017. Grant County PUD, other than sign for the Notice of Claim, did nothing else.

8. On July 31, 2017, Plaintiff Black received a Right to Sue letter from the Equal Employment Opportunity Commission that stated that Plaintiff had 90 days from the receipt of the Right to Sue letter to file a lawsuit or forever be barred from doing so.

## FACTUAL ALLEGATIONS

9. Plaintiff Black was hired by Grant County PUD on January 3, 2005.

10. At the time Plaintiff Black was hired, he had over 19 years of experience as a Journeyman, and several years prior as an apprentice lineman. Currently, he has 30+ years of experience as a Journeyman Lineman.

11. A review of Plaintiff Black's personnel file indicates that Plaintiff Black had a clean performance record (as far as the personnel file has not been redacted), he has garnered several Employee Recognition awards for job performance, and **no** disciplinary actions had been filed against him prior to July 12, 2016.

12. During his employment with the PUD, he has been recognized four (4) times as the Pole Top Rescue competition top two finishers and in 2017, at 59 years old, he earned 1st place. This reflects his continued capabilities, expertise and skills as a lineman, as he is

the most senior competitor by at least 20 years. As the PUD Pole Top champion of 2017, he and his teammate earned the right to compete in the state competition and were 4th place finalists. Plaintiff Black earned the right to attend and participate in the Kansas City International Lineman Rodeo four (4) times during his 12 years of employment at Grant County PUD. With no obligation or outside pressure, Plaintiff Black gave up his right to compete in Kansas City at the International Lineman Rodeo in Fall, 2017, so other qualifying team members, who had not experienced this level of competition, would have the opportunity to perform. Plaintiff Black opted to attend in the capacity of Judge.

13. Plaintiff Black was upgraded to Temporary Line Crew Foreman on March 12, 2012 and was upgraded to Permanent Line Crew Foreman on July 5, 2013.

14. Plaintiff Black has been a Grant County PUD employee for 12 + years. His hire anniversary is January 3.

15. The process and/or Policies and Procedures regarding new hires is done through an application, performance of a pole yard test, and a written test. Policies and Procedures relating to Promotions and Advancements are generally done by a bid process, with the senior most individual being awarded the promotion in most instances relating to union jobs. Some positions require specific qualifications that must be met in order to bid or apply for a position. On rare occasions, the PUD has a 'right of selection' process and can choose whomever they deem worthy of a position.

16. Policies and Procedures relating to discipline are administered pursuant to the PUD Discipline & Corrective Action Policy and as stated in Paragraph 2.0 of General Principles and paragraph 2.1 titled Corrective Action, "Corrective action should be fair." In Plaintiff Black's case, Discipline and Corrective Action, especially when compared with co-workers offenses, the policies were applied selectively and maliciously. See Complete Discipline & Corrective Action Policy attached Exhibit 1.

17. In late summer of 2016, Plaintiff Black applied for the Supervising Foreman Job that was opening due to the retirement of a colleague. The qualifications for Supervising Foreman specifically state in the Collective Bargaining Agreement between PUD District 2 of Grant County and Local Union No. 77 of the International Brotherhood of Electrical

workers, April 14, 2014 to March 31, 2017 on page 63, paragraph 6.2.6.1(b) and sub paragraph C, the following, to wit:

"Supervising Foreman job description will include 3 years of experience as foreman and a current foreman."

Plaintiff Black was one of two applicants that met this 3-year requirement as foreman and applied for the position. Both of the qualified applicants were over the age of 40, and both are members of the Mormon religion.

18. Both qualified applicants were accused of inappropriate behavior or ethics code violations by an anonymous person, and although the other candidate was allowed to correct the offense and remain eligible, Plaintiff Black was subsequently demoted due to the unwarranted, malicious and discriminatory discipline meted out. Due to the selective and malicious demotion, Plaintiff Black was determined to be ineligible for the Supervising Foreman position.

19. The PUD, by eliminating one of the two most senior and qualified candidates, opened their selection process by the terms under the collective bargaining agreement, page 63, paragraph 6.2.7, sub paragraphs A, B and C, and paragraph 6.2.8, ultimately selecting a foreman who was under 40 years of age, who did not have a three-year tenure as foreman and who is also non-Mormon. See Collective Bargaining excerpts cited in Attached Exhibit 3.

20. The selected Supervising Foreman currently participates as Commissioner of a Fantasy Football League at work which is an egregious ethics violation of an intermediate level (see ethics Policy Page 5) and within approximately the past 5 years was found in position of PUD tools and/or equipment in a shed at his residence. He had possession of these tools for over one year, which is an offense of a major level (see ethics Policy Page 2). It is unknown whether he received disciplinary action for this egregious offense. Current Supervising Foreman, uses Obscene and foul language occasionally, which is described as an intermediate offense pursuant to the Corrective & Disciplinary Action Policy (see page 3). As far as is known, he has never been demoted or deemed ineligible for promotion due to his ethics violations, which are on-going. Again, discipline is meted out maliciously, selectively, and without consistency. (See complete Code of Ethics attached as Exhibit 2)

21. The Incidents that ultimately resulted in Plaintiff Black's demotion and removal from eligibility for promotion to Supervising Foreman are two-fold and shall be referenced as Incident 1 and Incident 2 as follows, to wit:

**Incident 1-** August 4, 2016- Plaintiff Black had a job scheduled on Tuesday July 12, 2016 to remove and surplus a transformer from the South Ephrata Substation. Dispatch called Mr. Black and instructed him to move the existing clearance tags from the MOD doors to the decoupled mechanism to which he asked if it needed to be formally done and was told no formality was needed. Chris Heimbigner, Line Superintendent also called Mr. Black with the same instructions. An electrician, who is not qualified or authorized to work on the transmission line, was given a 25 mile clearance on the same line and took issue with the way Plaintiff Black hung the Clearance Tags which resulted in a complaint to dispatch. A miscommunication and lack of understanding as to the reason the procedure had suddenly changed without prior knowledge and/or training and immediately needed to be done in a manner it had never been done before, resulted in duplicate tags being hung. Mr. Black was accused of filling out incorrect E-numbers marked by order of Chris Heimbigner, which if indeed this happened, was due to human error and not a deliberate disregard for authority. An accusation of insubordination was issued against Plaintiff Black, with a disciplinary letter on August 4, 2016. Said disciplinary action resulted in two days leave without pay. Refer back to Discipline & Corrective Action Policy Paragraph 2, subparagraph 2.1, attached as Exhibit 3, which states the following, to wit:

> "Corrective action should be fair. This means that, while the District retains the discretion to determine what action is appropriate in any particular situation, the corrective action should be equal with the misconduct or performance deficiency at issue, and whenever possible, performance issues typically should be addressed, at least initially, with an eye to improvement. Before administering corrective action, consideration should be given to all relevant factors, such as:
>
> -How much trouble or damage did the misconduct cause?
> -How, if at all, did it affect others or District Operations?
> -Are there any potential future consequences?
> -Has the employee committed other misconduct, including but not limited to similar acts?
> -Has the employee already received a prior warning?

-Are there explanatory circumstances?"

This was Plaintiff Black's first offense of record. Plaintiff Black was not given the consideration to relate explanatory circumstances, nor did the offense cause any damage or result in any adverse consequences to the district. Based on Plaintiff Black's previous job performance and record, the accusation and discipline are above and beyond normal and usual discipline for similar offenses and violations committed by others and therefore are malicious and discriminatory due to his age and/or religious affiliation, and have been unwarranted. On February 21, 2017, training was initiated in a safety meeting on new Clearance/Tag procedures, several months after the incident in which Mr. Black was disciplined. Disciplinary action was applied willfully and inequitably against Mr. Black because of his age/and or religion. No targeting had been placed on Mr. Black prior to his application for the supervising foreman position.

**Incident 2-** October 4, 2016- Plaintiff Black contacted Chris Heimbigner, line superintendent, through the shop steward, Dennis Lanier, sometime in late spring/early summer 2016 and asked if the PUD could provide him with a new tool belt. At the time of this inquiry, Plaintiff Black's tool belt was over 30 years old, worn out and no longer fit as it should, thus becoming a potential safety issue. Plaintiff Black was told by the line superintendent that the PUD would provide a new belt for him. Refer to Collective Bargaining Agreement, Page 95, Article 7, subparagraph 7.15, which states the following, to wit:

> Hand Tools-Replacement- The District, on the recommendation of the Supervisor, shall replace unrecoverable, broken or worn out hand tools regularly used on the job. "Unrecoverable" shall be defined as hand tools lost in areas where retrieval is not possible or practical. This provision will include body belts.

Soon after the shop steward's discussion with Line Superintendent Heimbigner, Plaintiff Black ordered a new belt. The belt Plaintiff Black received, he discovered was at least a size too large making it uncomfortable, but determined he would make it work, although he was concerned with the size and the potential for safety issues with the belt. Approximately 3 months later, Dillon Watkins, a new journeyman lineman on Plaintiff Black's crew, was planning to buy the same tool belt Plaintiff Black had purchased. Mr. Watkins is larger than Mr. Black and they discussed Mr. Watkins purchasing Plaintiff Black's belt at a reduced

price. Mr. Black would then purchase a properly fitting belt with the money obtained from the sale and additional funds of his own. It was a simple solution for both Mr. Watkins and Plaintiff Black. Shortly after this exchange, Mr. Watkins was assigned to work for a different crew for a day. An anonymous co-worker took a photograph of the belt on the trailer of a truck and posted the photograph to snapchat. An 8 ½ inch by 11 inch color copy of the photograph was printed and wound up in Mr. Heimbigner's possession with an accusation of wrong-doing. No targeting of Plaintiff Black had occurred prior to his application for the position of Supervising Foreman. Plaintiff Black was falsely accused of selling company property for personal gain. The Ethics Code was very loosely interpreted, if appropriately at all, by the PUD and Mr. Heimbigner. The ethics code as relating to property, states the following:

> "Grant PUD property shall not be sold, used for personal benefit, loaned, given away, intentionally damaged, destroyed, or otherwise disposed of, regardless of condition or value. All dispositions of property shall be in accordance with the surplus property resolution."

The belt belonged to Plaintiff Black and was not PUD property. Research has verified that former employees of Grant PUD, have taken tools that have been purchased and provided to them by the PUD. This would indicate that property supplied to employees by the PUD, belonged to the employee; it was their personal property and was no longer PUD property upon distribution to the employee. The discipline was unwarranted, excessive and discriminatory due to Plaintiff Black's age and/or his religious affiliation. Plaintiff Black has no recollection of training on this specific subject in the Ethics code, prior to incident. Plaintiff Black signed off on Ethics Code training dated January, 2016 but this topic was not addressed in that training. On December 13, 2016, long after the incident occurred, training was given in the ABC morning meeting relating to PUD property and use/misuse thereof. The ethics policy and disciplinary action were applied selectively and not equitably across all Grant County PUD employees. Subsequently, the tool belt in question was returned to the acquisition department, and Plaintiff Black purchased his own belt with his own funds. Dillon Watkins is not in possession of the belt. Plaintiff Black did not gain anything monetarily in this exchange, nor did he intend to, the belt was confiscated upon the instruction of Chris Heimbigner, and as far as is known, is still in the acquisitions department not being used.

In a memo written on October 4, 2016 reciting his offenses and demotion, Plaintiff Black was not only demoted and threatened with termination, but was also denied any future opportunity to bid a foreman position until October 4, 2019 (Note: every current crew foreman in Moses Lake is much younger, so the consequences of the demotion have blocked the path for Plaintiff Black to be able to obtain foreman status before retirement age unless a colleague quits or is terminated). Further, he is accused of a second "major offense", in the PUD's Discipline and Corrective Action Policy. Refer to Discipline and Corrective Action Policy paragraph 2.0, subparagraph 2.1. which states "Corrective action should be fair." The demotion has caused serious financial harm to Plaintiff Black due to his age and inability to recoup the lost wages prior to retirement.

22. Due to the aforementioned incidents, Plaintiff Black's reputation has been tarnished and this has resulted in further adverse circumstances. Plaintiff Black applied for a lateral transfer (which was not disallowed as part of his discipline) as a dispatch trainee, for which he was the most senior, and arguably the most qualified applicant. This transfer would have ultimately provided him an opportunity to recoup the lost wages due to the unwarranted demotion. He was denied the opportunity for an interview, based on 'right of selection', which can be assumed to be based on lost reputation, prejudice against his age and religion.

23. The denial of a lateral transfer further impeded his capacity for increased earning potential as well as recovering his loss of an exemplary reputation. Of the two individuals selected for the trainee positions, one was a qualified lineman under 40 years old; the other an unqualified HVAC person, age unknown, with no knowledge of lines and service operations, making him a potential safety risk for the lines and service crews.

24. Plaintiff Black is a lay minister for the Church of Jesus Christ of Latter-day Saints, serving as Bishop to a congregation of over 300 people, whom he serves voluntarily and without any financial compensation. He is a respected member of his church and a respected citizen of the community. His ethical behavior has never been questioned by his church and community peers. Disciplinary Action against Plaintiff Black has resulted in substantial loss of current financial security, loss of future increased earning capacity, future retirement compensation and loss of reputation. The PUD and Chris Heimbigner,

Line Crew Superintendent, have been malicious with intent to do harm, discriminatory and selective, and have targeted Plaintiff Black due to his age and/or religious practices.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
*Age Discrimination in Violation of 29 U.S.C §623*

24. Plaintiff incorporates herein by reference relevant jurisdiction, venue, and general and factual allegations set forth with specificity in paragraphs 4 through 24 of this Civil Complaint and Jury Demand as if set forth *verbatim*.

25. Defendant, Grant County Public Utility District is an employer subject to *42 U.S.C. 2000e*.

26. Chris Heimbigner, individually in his employment capacity is the Line Crew Superintendent, is an employee of the Defendant, Grant County Public Utility District, and was acting within the scope of his employment during the course and subject of this action.

27. Plaintiff Black as a person over the age of 40 is a member of a protected class.

28. Plaintiff Black was the oldest and most qualified for the position he held with Defendant Plaintiff Black was the oldest and one of two most qualified for the position of Supervising Foreman for which he applied. Plaintiff Black was also the oldest and most qualified for the position of Dispatch Trainee for which he applied as well.

29. For the position Supervising Foreman Job, Plaintiff Black was not promoted, but in fact was wrongfully demoted by Defendants.

30. Plaintiff Black was not given a positon that he applied for and was most qualified for; instead it was given to an unqualified employee under the age of 40. (note that with respect to the Dispatch trainee position, unqualified HVAC employee age is unknown)

31. Upon information and belief, Plaintiff Black was denied advancement within the company and wrongfully demoted by Defendants in part because Plaintiff was over the age of 40.

32. Prior to Plaintiff's job advancement denials and demotion by Defendants, Plaintiff Black, together with one other applicant over 40 years old and also a Mormon, was the most qualified for the position of supervising foreman, had a good employment record with the Defendants, and any poor or low employee ratings, write-ups, or disciplinary action were the direct result of attempts to hide the Defendants' discrimination against the Plaintiff.

33. The reasons for Plaintiff's job advancement denials and demotion with Defendants were pretextual.

34. Upon information and belief, age was a determinative factor job advancement denials and demotion by Defendants to the Plaintiff.

35. Age is not a bona fide occupational qualification of Plaintiff's position with the Defendants.

36. As a proximate result of Defendants' age discrimination under *29 U.S.C. §623* the Plaintiff has been damaged in an amount to be determined at trial.

37. Pursuant to *29 U.S.C. §623*, Plaintiff is entitled to an award of his reasonable attorneys' fees incurred in this litigation.

## SECOND CLAIM FOR RELIEF
*Religious Discrimination in violation of 42 U.S.C. 2000e*

38. Plaintiff incorporates herein by reference relevant jurisdiction, venue, and general and factual allegations set forth with specificity in paragraphs 4 through 24 of this Civil Complaint and Jury Demand as if set forth *verbatim*

39. Defendant, Grant County Public Utility District is an employer subject to *42 U.S.C. 2000e.*

40. Chris Heimbigner, in his employment capacity is a Superintendent, is an employee of the Defendant, Grant County Public Utility District, and was acting within the scope of his employment during the course and subject of this action.

41. Plaintiff Black as a member of the Church of Jesus Christ of Latter-Day Saints, commonly known as Mormons or LDS is a member of a protected class.

42. Plaintiff Black was the most qualified for the position he held with Defendant. Plaintiff Black was one of two most qualified for the position of Supervising Foreman job, for which he applied. Plaintiff Black was also the most qualified applicant applying for the Dispatch Trainee position.

43. For the Supervising Foreman job, Plaintiff Black was not promoted, but in fact was demoted wrongfully by Defendants.

44. Plaintiff Black was not given a positon that he applied for and was most qualified for; instead it was given to an unqualified employee who is not a member of the Church of Jesus Christ of Latter-Day Saints, commonly known as Mormon or LDS.

45. Upon information and belief Plaintiff Black was denied advancement within the company and wrongfully demoted by Defendants in part because Plaintiff was member of the Church of Jesus Christ of Latter-Day Saints, commonly known as Mormon or LDS.

46. Prior to Plaintiff's job advancement denials and demotion by Defendants, Plaintiff, Black, together with one other applicant over 40 years old and also a Mormon, was the most qualified for the position of Supervising Foreman, had a good employment record with the Defendants and any poor or low employee ratings, write-ups, or disciplinary action were the direct result of attempts to hide the Defendants' discrimination against the Plaintiff.

47. The reasons for Plaintiff's job advancement denials and demotion with Defendants were pretextual.

48. Upon information and belief, Plaintiff Black's membership in The Church of Jesus Christ of Latter-Day Saints, a religion, and/or his religious practices were determinative factors for the job advancement denials and demotion by Defendants.

49. Plaintiff Black's membership in The Church of Jesus Christ of Latter-Day Saints, a religion, his religious affiliation, his religious beliefs and his religious practices are not a bona fide occupational qualification of Plaintiff's position with the Defendants. Moreover, Plaintiff Black's membership in The Church of Jesus Christ of Latter-Day Saints, a religion, his religious affiliation, his religious beliefs, and his religious practices are not a bona fide basis for employment promotion or denial.

50. As a proximate result of Plaintiff Black's membership in The Church of Jesus Christ of Latter-Day Saints religion, his religious affiliation, his religious beliefs, and his religious practices under *29 U.S.C. §623* Plaintiff has been damaged in an amount to be determined at trial.

51. Pursuant to *29 U.S.C. §623*, Plaintiff is entitled to an award of his reasonable attorneys' fees incurred in this litigation.

### JURY DEMAND

Trial by Jury is demanded on all issues.

///

///

///

///

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment against Defendants as following:

    1.    That Defendants take nothing by way of this action.

    2.    Mr. Black be awarded fully and fairly for his injuries, damages, losses both past, present and future.

    3.    Mr. Black be awarded post-judgment interest.

    4.    Mr. Black be awarded any costs, fees, and attorneys' fees.

    5.    Mr. Black be awarded any other relief that this Court finds just and equitable.

DATED this ___27th___ day of October, 2017.

                                   _____/s/Ryan T Earl_____
                                      Ryan T. Earl

**VERIFICATION**

**STATE OF WASHINGTON**    )
                                )ss
**COUNTY OF GRANT**         )

WAYNE R. BLACK, being first duly sworn upon oath, says:

That he has read the above foregoing Complaint; that he knows the contents thereof and believes that the facts stated herein are true.

                                    WAYNE R. BLACK

SUBSCRIBED AND SWORN to before me this 27th day of October, 2017.

NOTARY PUBLIC FOR WASHINGTON

Residing at: Moses Lake
Commission Expires: 3/1/2020

## Discipline & Corrective Action Policy
Revised: 07/25/2011

**1.0    Policy**

The District expects employees will not fail to act professionally and in the District's best interests at all times.  The District believes in the ability of its employees to do so through the exercise of sound judgment and common sense.

**2.0    General Principles**

**2.1    Corrective Action**

Corrective action should be fair.  This means that, while the District retains the discretion to determine what action is appropriate in any particular situation, the corrective action should be equal with the misconduct or performance deficiency at issue and, whenever possible, performance issues typically should be addressed, at least initially, with an eye to improvement.  Before administering corrective action, consideration should be given to all relevant factors, such as:

> ➢ How much trouble or damage did the misconduct cause?
> ➢ How, if at all, did it affect others or District operations?
> ➢ Are there potential future consequences?
> ➢ Has the employee committed other misconduct, including but not limited to similar acts?
> ➢ Has the employee already received a prior warning?
> ➢ Are there explanatory circumstances?

**2.2    Communication**

Effective communication is critical to the successful resolution of performance-related issues.  Consequently, the District strongly encourages supervisors and managers to document performance issues and related corrective action.  This includes documenting verbal warnings. Such documentation should be discussed with the employee at issue and given to him or her to sign.  The employee's signature acknowledges receipt and explanation of the document, not necessarily agreement with its content.  An employee may refuse to even sign a document for this limited purpose.  If that occurs, the supervisor/manager should simply record the employee's refusal to sign on the document.  The goal of the documentation is to enhance understanding between management and staff through written confirmation of the major points of discussion. Employees may prepare responses or rebuttals if they so desire.

**2.3    Employee Rights**

l

EXHIBIT 1  pg 1

Corrective action must be administered with due consideration of, and respect for, employee rights and expectations, whether those rights and expectations derive from employment policies, operation of law or contract. As just one example, all union-represented employees are entitled to union representation during any meeting that may reasonably be expected to lead to disciplinary action.

### 2.4    Resources

Supervisors will not fail to first review disciplinary actions on difficult issues with the Human Resources Department. Particularly when especially severe corrective action, such as suspension and/or discharge, is under consideration.

## 3.0    Reasons For Corrective Action

Violations of the District's standards of conduct and/or the failure or refusal to meet work performance requirements are unacceptable and may result in corrective action. The acceptability of certain conduct often turns on the specific facts and circumstances involved. No organization can accurately anticipate and list every type of conduct or work performance that is unacceptable. The District does not try to do so here. Instead, the District provides some examples, which are intended to broadly illustrate, without limiting, the types of conduct and work performance it may consider unacceptable, and to what degree. These are only guidelines. To be able to appropriately respond to whatever particular circumstances may arise in the future, the District must, and does, reserve the right to determine the categorization of, and response to, any conduct or performance concern, regardless of where it falls within the broad parameters set forth below.

### 3.1    Minor

Minor offenses and performance-related concerns are actions we typically consider correctable by training, counseling and guidance, and not necessarily serious enough for formal corrective action unless repeated. Examples of minor offenses are first instances of:

➢  Tardiness and/or absenteeism.

➢  Using work time for personal activities.

➢  Performance that does not meet our requirements.

EXHIBIT 1  pg 2

3.2    Intermediate

Intermediate offenses and performance-related concerns are actions we typically consider severe enough to call for formal corrective action, usually short of discharge, for the first violation.  Examples of intermediate offenses are:

➢ Repetition of a minor offense.

➢ Gambling on District property and/or during an employee's compensated work time.  See District's Code of Ethics policy for additional information.

➢ Obscene or foul language.

➢ Unexcused absence.

➢ Unauthorized distribution of literature or advertising material.

➢ Unauthorized tampering with and removal or alteration of notices and signs.

➢ Solicitation of employees during work time or in work areas.

3.3    Major

Major offenses and performance-related concerns are actions we typically consider severe enough to call for prompt and severe corrective action up to and including immediate discharge without prior warning or counseling. Examples of major offenses include, but are not limited to:

➢ Repetition of an intermediate offense.

➢ Unauthorized use or release of confidential information.

➢ Insubordination or deliberate failure or refusal to carry out instructions.

➢ Misusing, destroying, or purposely damaging District property or property of an employee.

➢ Unauthorized use or removal of District property.

➢ Falsifying records, including employment applications or time sheets.

➢ Unlawful harassment, discrimination or retaliation.

➢ Threatening, abusive, intimidating and/or violent conduct.

3

EXHIBIT 1  pg 3

> Violation of the District's drug and alcohol policy.

> Unauthorized possession of firearms and/or other weapons on District property or time.

> Disregard or failure to follow safety and/or security regulations, practices and/or procedures.

This policy is not intended to be a complete list of all circumstances that may result in corrective action or discharge. The rules set out here are intended only as guidelines, and do not give any employee a right to continued employment or any particular level of corrective action.

4.0    Corrective Action

The general goal of the District's corrective action policy is to correct unsatisfactory behavior or performance. To that end, where appropriate in its judgment, the District will apply less severe corrective action initially, and more severe measures if the problem persists. However, this is only a guideline. The District does not promise employees that a specific formula of progressive discipline will be followed in every instance. Different circumstances warrant different responses. Unless otherwise prohibited by law, when the District concludes that an employee has not adhered to its standards or that performance otherwise is unsatisfactory, the District may take the corrective action it decides is appropriate under the circumstances, which may involve any one or combination of the steps identified below, up to and including immediate discharge without prior corrective action or notice.

4.1    Verbal warning

This is generally used in cases of minor offenses. Its purpose is to inform and train the employee regarding correct behavior and performance. The supervisor and employee should reach an understanding of the specific sources of dissatisfaction and the corrective actions required. The supervisor must document the warning and related understanding, present it to the employee for signature, and place a copy in the employee's personnel file located in the Human Resources Department.

4.2    Written warning

This is generally used for intermediate offenses, repetition of or failure to correct a minor offense, commission of another type of minor offense within a reasonable time, or persistent performance deficiencies. A written warning typically will be issued after the employee has received one or more verbal warnings for misconduct, whether of the same nature or not. The written warning should identify the problem and any improvement required, refer to any previous warnings or actions taken, and explain the consequences of repeated infractions or failure to correct performance. The employee should sign the warning and receive a copy. A copy must

4

EXHIBIT 1 pg 4

be placed in the employee's personnel file located in the Human Resources Department.

### 4.3    Probation

A probationary period, which may be imposed before, after or in combination with any of the other corrective actions identified, does not guarantee the employee will remain employed to the end of the specified period.   Further, successful completion of probationary status does not guarantee later employment or limit our discretion with respect to later corrective action or discharge.

### 4.4    Suspension

Suspension, which may be imposed before, after or in combination with any of the other corrective actions identified, may be used as a corrective measure, to permit an investigation, to allow the District time to determine what corrective action will be applied, or to remove an employee from the premises for a period of time.  For exempt salaried employees (employees not eligible for overtime), a suspension will be unpaid only if the employee is suspended for an entire work week or for violation of a safety rule of major significance.

### 4.5    Discharge

This is generally used in cases of major offenses, repeated or uncorrected minor or intermediate offenses after at least one written warning, continued performance deficiencies (previously identified in a written performance evaluation or written warning), or unacceptable responses to corrective action by the employee.   In general, discharges are to be reviewed by the General Manager and Human Resources Department before being communicated to the employee.  In some cases, however, this may not occur.  If an employee is discharged before the decision is reviewed by the General Manager and Human Resources Department, the discharge will still be effective immediately but the District may, at its discretion, reverse the discharge after it is reviewed. The discharge decision should be documented by the employee's direct manager or supervisor in a memorandum, which identifies the reason(s) for the termination, the previous attempts to correct the situation, if any, and the terms of the termination.  The termination letter must be placed in the employee's personnel file located in the Human Resources Department.

EXHIBIT 1 pg 5

| Implement on: 8/1/14 | Version: 0 Supersedes: | See Also: HR150040A-REF |
|---|---|---|

 Grant PUD

# POLICY

| Approved by: Commission | Regulation: RCW Chapter 42 RCW 9.46.0237 RCW 9.73.030 Resolution 8732 |
|---|---|

# HR150040-POL – CODE OF ETHICS

This policy provides guidance to all employees including Officers and Commissioners with regard to conduct. Hereinafter this group shall be referred to as "employees".

1. **Employees Are Expected To Exhibit High Ethical Standards When Conducting Grant PUD Business.**

   RCW Chapter 42, Code of Ethics for Municipal Officers may restrict activities more than this policy. The absence of specific situation discussed herein does not relieve an employee from the responsibility to exercise high ethical standards involving utility business. Employees are responsible for disclosures of possible conflicts of interest and, when in doubt about their actions, they are responsible for asking for guidance from their supervisor or the Ethics Committee.

2. **An Ethics Committee Will Review Questions Related To This Policy And Make Recommendations As Appropriate.**

   The Ethics Committee will be comprised of three directors. These three positions will rotate annually. See HR150040A-REF.

3. **All Employees, Officers, and Commissioners Are Responsible For Being In Compliance With The Following Items:**

EXHIBIT 2 pg 1

| Implement on: 8/1/14 | Version: 0 Supersedes: | See Also: HR150040A-REF |
|---|---|---|

 Grant PUD

# POLICY

| Approved by: Commission | Regulation: RCW Chapter 42 RCW 9.46.0237 RCW 9.73.030 Resolution 8732 |
|---|---|

**Records**:  All utility records including time sheets must be prepared accurately. Preparing a false or misleading report or record is a serious offense and violation of this policy. A record or report includes, but is not limited to any "public record" as defined by RCW 42.17.020.

**Confidentiality**:  Records containing personal or confidential information will be disclosed only to authorized personnel having a "need to know" or as may be required by law.

**Funds/Monetary Assets**:  Employees who have control over utility funds (e.g. credit cards, accounts payable and payroll) are strictly accountable for such funds. Every expenditure of funds shall be reasonable, necessary and within policy. Anyone approving or certifying the correctness of any voucher or bill is required to have knowledge that the expense and amounts involved are justifiable and proper.

**Property**:  Grant PUD property shall not be sold, used for personal benefit, loaned, given away, intentionally damaged, destroyed, or otherwise disposed of, regardless of condition or value. All dispositions of property shall be in accordance with the surplus property resolution.

Employees who have input into the decision and approval process pertaining to the declaration of property as surplus to the needs of the utility shall not participate directly or indirectly in bidding on or purchase of such surplus property. Executive level management staff (Director and above), shall not, in any event, participate in the purchase of surplus property.

| Implement on: 8/1/14 | Version: 0 Supersedes: | See Also: HR150040A-REF |
|---|---|---|



# POLICY

| Approved by: Commission | Regulation: RCW Chapter 42<br>RCW 9.46.0237<br>RCW 9.73.030<br>Resolution 8732 |
|---|---|

Employees are also prohibited from purchasing utility property which was originally purchased for or used by the department where they work. Additionally, they shall not directly, or indirectly, participate in such a purchase, nor shall they have any direct or indirect financial interest with any person or entity which purchases such property.

**Procurement Ethics:**  It is the policy of the utility to award business solely on merit, at the lowest reasonable price, and when required, on a competitive basis. Employees with procurement responsibilities or control over or access to project specifications shall not be beneficially interested, directly or indirectly, in any contract which may be made by, through or under the employee, in whole or in part, or which may be made for the benefit of him or her, or accept, directly or indirectly, any compensation, gratuity or reward in connection with such contract from any other person beneficially interested therein.

**Gifts, Gratuities, and Favors:**  Individuals covered by this policy shall not solicit or accept, directly or indirectly, gifts, gratuities, or favors from a supplier, prospective supplier, customer or their employees or agents; provided however, that gifts of cookies, candies or other food items received and shared with other employees in the recipient's work area are not prohibited.  The intent of this exception is to sensibly accommodate receipt of such items that arrive unsolicited from vendors during holidays or as an occasional thank you such that no one individual employee benefits. All employees who conduct negotiations with current or prospective suppliers, contractors or customers will make certain that their representatives are

| Implement on: 8/1/14 | Version: 0 Supersedes: | See Also: HR150040A-REF |
|---|---|---|



# POLICY

| Approved by: Commission | Regulation: RCW Chapter 42<br>RCW 9.46.0237<br>RCW 9.73.030<br>Resolution 8732 |
|---|---|

fully informed of the utility's policy. For the purpose of this policy, advertising items of a nominal value are not considered gifts (calendars, notepads, hats, etc.). Grant PUD Officers are subject to further restrictions under RCW 42.20 and 42.23.

**Entertainment and Hospitality**:  Offers of entertainment, hospitality, business courtesies, tickets, hotel accommodations, passes or other favors from customers, current or prospective suppliers or other persons or entities whose interests may be substantially affected by the performance of the employee's official duty, no matter how innocent in appearance, may not be accepted. An employee may accept food or refreshments of nominal value on infrequent occasions in the ordinary course of a meeting or during an inspection tour where an employee may properly be in attendance. Officers are subject to further restrictions under RCW 42.20 and RCW 42.23.

**Use of Position**:  Whether or not specifically prohibited elsewhere in this policy, employees shall also not create the appearance of:

    a. Using public employment for private gains, privilege, favor or advantage;
    b. Giving preferential treatment to any person
    c. Knowingly impeding utility efficiency or economy
    d. Affecting adversely the confidence of the public in the integrity of Grant PUD

**Post-Employment Representation**:  Grant PUD employees shall not accept employment or engage in any

EXHIBIT 2 pg 4

| Implement on: 8/1/14 | Version: 0<br>Supersedes: | See Also: HR150040A-REF |
|---|---|---|

 Grant PUD

# POLICY

| Approved by: Commission | Regulation: RCW Chapter 42<br>RCW 9.46.0237<br>RCW 9.73.030<br>Resolution 8732 |
|---|---|

business or activity which might require the employee to disclose confidential information, without prior approval of the Commission. Violation of this provision may cause any Contract in existence to be invalidated. Employees and consultants may be required to sign a confidentiality, non-disclosure, and post-employment agreement.

**Gambling**:  Gambling is prohibited on Grant PUD property and/or during an employee's compensated work time. Gambling means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome (RCW 9.46.0237). Examples include, but are not limited to raffles, sports pools, check pools, or any activity defined as "gambling" by the Washington State Gambling Commission.

**Recording Private Communications:**  Recording conversations with cell phones or any other recording device, whether these conversations are by telephone, radio, in person, or by any other means, is prohibited and may violate state criminal law, unless  done with the consent of all parties involved (see RCW 9.73.030)

## 4.   Employees Are Required To Report Violations Or Suspected Violations Of This Policy

Employees are encouraged to report unethical behavior or acts to their supervisor or the ethics committee.  All reports will be taken seriously and investigated.  The District will protect the confidentiality of those involved to the extent

| Implement on: 8/1/14 | Version: 0 Supersedes: | See Also: HR150040A-REF |
|---|---|---|

 Grant PUD

# POLICY

**Approved by: Commission**

**Regulation: RCW Chapter 42**
**RCW 9.46.0237**
**RCW 9.73.030**
**Resolution 8732**

it can, consistent with the need to investigate and resolve the problem. No employee will be retaliated against for good faith efforts to comply with this policy.

## 5. <u>Unethical Behavior Could Lead To Disciplinary Action</u>

Every employee should understand that any violation of these basic standards of business conduct will subject the employee to disciplinary action, up to and including termination from the utility in addition to civil fines, penalties and criminal prosecution where appropriate.

Concerns or complaints not filed in a "good faith" manner could lead to disciplinary action as defined by the Discipline and Corrective Action policy.

    C.    Require a score of 80% or higher on tests or evaluations administered by the interview and selection committee for the candidate to be included in the qualified pool.

    D.    Individuals must demonstrate satisfactory performance to maintain position in pool through evaluation process.

    E.    Implement standard evaluation process and utilize defined performance criteria.

    F.    Through Labor-Management, identify pool of trained interviewers and testers.

6.2.6.1(b)  Supervising Foreman/Chief Operators will be selected by:

    A.    Management/Union Committee (3/3) Right of Selection from qualified internal candidates.

    B.    Chief Operator job description will include 3 years experience as senior and a current senior.

    C.    Supervising Foreman job description will include 3 years experience as foreman and a current foreman.

6.2.7  If the District does not, within the time provided in Section 6.2.2 above, receive any bids on a job which has been posted, or does not receive a bid from an employee who possesses the qualifications as set forth in 6.2.5 above, the District may fill the job by:

    A.  Hiring from outside

    B.  Appointing the least senior qualified employee, or

    C.  Appointing any employee who bid the position and has demonstrated to the satisfaction of the District an ability to be trained for the position.

6.2.8    When both the Union and the District agree, the bidding procedure can be waived in favor of advancing the eligible employee(s).

6.2.9    <u>Temporary Assignments.</u> Notwithstanding other provisions of this Agreement, the District may offer, and employees may accept, temporary work assignments of ninety (90) days or less. Such assignments will be limited to personnel in the headquarters in which they occur. Such offers, if and when made, will be based on the appropriateness of the employees for the temporary assignment as determined by the District. It is understood that such assignments are offered and accepted as being begun and ended without the payment of special shift rates, short change, or penalties avoided by the use of temporary hires for such assignments.

6.3    <u>Reduction-in-Force and Recall</u>

6.3.1    Reduction-in-Force

EXHIBIT 3 pg 1