FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 26, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WAYNE R. BLACK,<br><br>      Plaintiff,<br><br>  v..<br><br>GRANT COUNTY PUBLIC UTILITY DISTRICT, a statutory nonprofit corporation,<br>      Defendant. | NO: 2:17-CV-365-RMP<br><br>ORDER DENYING MOTIONS TO STRIKE AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT are Cross-Motions for Summary Judgment by

Plaintiff Wayne Black, ECF No. 66, and Defendant Grant County Public Utility

District (the "PUD"), ECF No. 69. The parties also have moved to strike various

documents associated with the Cross-Motions for Summary Judgment. The PUD

moves to strike a portion of the expert testimony Black cited in support of his

Motion for Summary Judgment. ECF No. 94. Black moves to strike declarations

filed by the PUD in support of summary judgment, ECF Nos. 93, 110, and 79. ECF

No. 114. The PUD moves to strike Black's reply. ECF No. 116. Having reviewed

the Motions, the accompanying filings, and the relevant law, as well as having heard

oral argument from the parties on May 22, 2019, the Court is fully informed.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

The PUD hired Black as a lineman on January 3, 2005. ECF No. 83-1 at 9.

Black was then 47 years old with nineteen years of experience as a journey-level

lineman. *Id.* at 17. The average age of the PUD's workforce is 46. ECF No. 81 at

2. Half of the Line Department is over forty. *Id.*

Black is a lifelong member of the Church of Jesus Christ of Latter-day Saints

("LDS"), and he serves as a bishop in his local ward. ECF No. 83-1 at 5. Black

recalled being asked by a fellow lineman, Eric Huber, around the time that he started

working at the PUD, whether he was Mormon. *Id.* at 8−9. Huber also is Mormon.

*Id.* at 9−10. Other than that brief interaction, which Black did not remember in

detail, Black did not recall any other instances in which he was asked about his

religion while working for the PUD. *Id.* at 10−11. He further asserted that he did

not discuss his religion at the workplace and left "that at home, at the church." *Id.* at

8. His coworkers did the same. *Id.* at 13. However, Black submitted that people at

the PUD were aware of his religion, although he was not aware of how they knew.

*Id.* at 11. When asked specifically whether, during his employment at the PUD, he

ever heard anyone making negative or disparaging remarks about Mormonism or

any religion, Black responded that he could not recall any instances of that nature. ECF No. 83-1 at 14.

From 2005 through July 2016, Black had a clean record at the PUD, without any discipline, and received several employee recognition awards.  ECF No. 83-1 at 19−20.  Black became a temporary line crew foreman in March 2012 and was elevated to permanent line crew foreman in July 2013.  *Id.* at 20−21.

However, as early as 2014,[1] crew member Ryan Bingham reported to Line Superintendent Chris Heimbigner, Black's "boss's boss," that Black had asked Bingham and other crew members to report more time than they actually had worked.  ECF Nos. 79-2 at 20; 89 at 2; 96 at 2.

Bingham recalled that Heimbigner "some time later . . . called a foremen's meeting and distributed a document outlining his expectations for the line department, which included that, going forward, all overtime had to be approved in advance by a Supervising Foreman."  ECF No. 79-2 at 20.  There is no indication that Heimbigner initiated an investigation into the allegations of inaccurate reports or that any discipline was contemplated or imposed.

///

---

[1] The record is unclear as to whether the report regarding time sheets was made sometime in summer 2014 or in November 2016.  *Compare* ECF No. 89 at 2 (Heimbigner recalled being told by Bingham in November 2016) *with* ECF No. 67-2 at 35−37 (Bingham recalled that he had told Heimbigner of a time sheet issue in approximately 2014).

***Tagging Incident***

Employees of the PUD who perform safety checks rely on clearance tags to confirm that electricity has been properly turned off at necessary points. ECF No. 71 at 2. In spring 2016, Heimbigner informed all foremen from the PUD's Line Department and Electric Shop that clearance tags for Motor Operated Disconnect ("MOD") devices were to be hung on the device and not on the cabinet door. *Id.* at 3. Black maintains that he "barely" recalled the meeting at which Heimbigner gave the instruction and that he preferred the former practice of hanging the clearance tags on doors. ECF No. 83-1 at 418.

During a safety inspection on July 12, 2016, PUD Power System Electrician Ron Dodd, acting as foreman at the time, found that Black had hung his clearance tags on the cabinet doors to the MOD device rather than on the device itself. ECF No. 71 at 2. In consultation with supervisors, Dodd refused to give clearance to allow a Hydro crew to begin work removing a transformer from a substation until the tags were placed in the correct position and removed from the incorrect location. *Id.* at 2−3; *see also* ECF No. 110-2 at 3. By telephone, System Operator Mike Lanes[2] and Heimbigner instructed Black to move the tags. ECF Nos. 74 at 5; 83-1 at 413; 110-2 at 2.

---

[2] The Court notes that Lanes is referred to as "Layne," in Black's deposition transcript, ECF No. 83-1 at 1-107, but that Lanes' own declaration uses the spelling used throughout this Order.

When Dodd reperformed his safety check, he found that Black had made new tags and hung them in the correct location. ECF No. 74 at 6. However, the content of the new tags was incorrect, as it indicated that clearance had been ordered by Heimbigner, who was not authorized to give clearance or switching orders. *Id.* Black recalled that he did not think Dodd was qualified to direct Black to move the tags, and he did not know why Lanes and Heimbigner listened to him when they orally directed Black to move the tags. ECF No. 83-1 at 422−23. Black also opined that it "would have been probably proper" for Lanes and Heimbigner to have sent Black a printed switching order by courier ordering him to move the clearance tags, and he would have better understood the nature of the directive. *Id.* at 423. After the second failed clearance, Dodd released the Hydro crew for the day to return the next day, at which point Black had corrected the tags and Dodd accepted the clearance for the crew to work on the transformer. *Id.* at 3−4.

At Heimbigner's request, Andrew Munro, Customer Service Division Director, Mike Tongue, then-Dispatch Manager, and Karrie Buescher, in Human Resources, investigated the matter and determined that a number of corrective actions were appropriate. ECF No. 76-1 at 2. The corrective action specific to Black entailed a written warning for failure to follow instructions as well as a two-day suspension without pay. ECF Nos. 74 at 7; 75 at 2; 76 at 6; 76-1 at 4; 76-2 at 2. The warning letter, signed by Black, cautioned, "Any future actions of this nature

will result in further disciplinary action, including removal of foreman position and up to immediate discharge." ECF No. 76-2 at 2.

### Tool Belt Incident

On approximately September 21, 2016, lineman Austin Schwint reported to Heimbigner that Black had sold a tool belt that had been purchased by the PUD to a probationary lineman, Dillon Watkins. ECF Nos. 82 at 10; 83-1 at 400. Heimbigner recalled that Black had asked him in approximately February 2015 for the PUD to replace Black's tool belt on the basis that it was worn out and no longer fit him. ECF No. 82 at 9. The PUD purchased a new belt for Black and retained the invoice, stating a total cost of $501.11. ECF Nos. 82 at 9; 82-2 at 2.

Heimbigner investigated the matter by interviewing Black and Watkins and reviewing PUD records and its Code of Ethics. ECF No. 82 at 11−12. According to Heimbigner, Black represented that he had intended to purchase a replacement belt himself, but had not yet done so. *Id.* at 11. Heimbigner "concluded that Mr. Black knew he had done something wrong because he had immediately pleaded for leniency." *Id.* at 11. Black maintains that he had thought that the tool belt that the PUD had purchased for him became his property when it replaced his previous belt, which he had brought with him from his previous employment. ECF No. 95-2 at 12.

Heimbigner concluded that Black had sold Watkins a tool belt, for $400, that was property of the PUD at the time it was sold, and that this action violated the PUD's ethics policy. ECF No. 82 at 11. Senior Human Resources Manager Darla

Stevens and Munro also were involved in the ultimate determination of the appropriate level of discipline and supported Heimbigner's conclusion. ECF Nos. 81 at 5; 82 at 11−12.

As a result of the tool belt incident, and in consideration of the previous tagging incident, the PUD demoted Black on October 4, 2016, from his foreman position to lineman and deemed him ineligible to bid on a foreman position for three years. ECF Nos. 76 at 10; 82 at 11; 83-1 at 172.

### Supervising Foreman Position

Sometime in summer 2016, Black applied for a supervising foreman position with the PUD. ECF No. 83-1 at 20. Line crew foremen report to supervising foremen at the PUD. *Id.* at 24.

On approximately September 21, 2016, Heimbigner informed Andrew Munro about receiving the report that Black had sold the PUD-purchased tool belt. ECF No. 76 at 10. However, Heimbigner and Munro decided not to inform other members of the supervising foreman hiring committee of the allegations. *Id.*

On September 22, 2016. Black was interviewed by the committee, composed of three PUD managers and three union members. ECF No. 81 at 3. Black was approximately 58 years old at the time. ECF No. 83-1 at 20. Five of the committee members were over age 50. *See* ECF Nos. 73 at 1; 79 at 3. The three managers were Steven Fisher, Heimbigner, and Munro. ECF Nos. 76 at 8; 81 at 3. The committee interviewed Black's colleague Huber on the same day. *Id.* at 8. Munro

recalls that the committee unanimously agreed that both candidates interviewed poorly. *Id.* at 9. Furthermore, the committee was unanimous that Black should not be awarded the position. *Id.*; *see also* ECF No. 73 at 5.

The Collective Bargaining Agreement ("CBA") in place at the time provided that the job posting for a supervising foreman "should include three years of experience as Foremen[.]" ECF No. 76 at 9. The managing members of the hiring committee sought guidance from Stevens regarding whether they could interview two other applicants for the position, both of whom did not have the requisite three years of experience as foreman. *Id.* Munro recalled that Stevens advised "that the CBA provided management a 'right of selection,' which allowed [the committee] to interview the other two candidates in this scenario." ECF No. 76 at 9; *accord* ECF No. 81 at 3. The committee interviewed two other candidates, Nick Sickels and Bingham. ECF No. 73 at 4−5. Committee member Fisher recounted that both Sickels and Bingham interviewed well, and the consensus of the committee was that they were both good candidates. *Id.* at 5. Since Sickels was only a few months shy of having three years of experience as a foreman, the committee awarded him the position in consideration of his seniority. *Id.* at 4−5.

### *Distribution Dispatch Position*

In December 2016, Black applied for a lateral transfer to a training position in the Distribution Dispatch Department. ECF No. 95-2 and 14. Dispatch Manager Jesus Lopez was responsible for hiring. ECF No. 73 at 5. Although Lopez initially

intended to interview all thirteen applicants, Stevens instructed Lopez to interview only five candidates. ECF No. 75 at 5. In approximately January 2017, he asked his supervisor Fisher for advice about narrowing the applicants to a group of five interviewees. ECF No. 73 at 5. Fisher advised against interviewing Black based on Fisher's opinion that Black interviewed poorly for the supervising foreman position, and Fisher conveyed his belief that Black recently had been disciplined. *Id.* at 5–6. Lopez further submitted that he personally had interacted with Black sometime between June 2015 and December 2016 and had rejected a proposal by Black to perform work on an energized transmission line. ECF No. 75 at 6. Lopez recalled that Black had responded in "an angry tone." *Id.* at 6. That interaction convinced Lopez that Black did not have the appropriate temperament for the Distribution Dispatcher position. *Id.*

Black was not interviewed and was not offered the position of Distribution Dispatcher. ECF No. 95-2 at 14. Black denies that he asked to work on an energized transmission line or ever previously interacted with Lopez. *Id.* Black also contends that he was qualified for the Distribution Dispatch position and had trained one of the candidates, Dustin Kagele, who was in his early thirties and was ultimately selected for one of the two open positions. *Id.*

### Supervising Foreman Hiring in 2018

The PUD filled another supervising foreman position, this time at the Ephrata Service Center, in January 2018. ECF No. 70 at 3. One of the union

representatives, Tony Alberti, and one of the PUD managers, Heimbigner, on the hiring committee also had participated in the fall 2016 hiring committee in which Black was not selected for the other supervising foreman position. *Id.* at 1−3. Alberti recounted that the committee was unanimous that Scott Elliott was the best candidate, that Alberti has long known that Elliott is a member of the LDS church, and that Elliott's religion did not play a role in Alberti's decision to support Elliott's promotion. *Id.* at 3.

### *Right-to-Sue Letter and Complaint*

The PUD received a "Notice of Claim for Damages" from Black on April 4, 2017. ECF No. 1 at 2. On July 31, 2017, Black received a "right to sue" letter from the Equal Employment Opportunity Commission indicating that Black had ninety days to file a lawsuit. *Id.* Black filed this lawsuit on October 27, 2017, against the PUD. *Id.* at 12. On November 15, 2018, with the Court's leave, Black amended his complaint to state, among other new claims, retaliation claims under 42 U.S.C. § 2000e ("Title VII") and 29 U.S.C. § 623 (the Age Discrimination in Employment Act of 1967, or "ADEA"). ECF No. 49.

On March 8, 2019, with the Court's leave, Black filed a second amended complaint stating federal claims of age and religious discrimination, under the ADEA and Title VII, retaliation claims arising out of his age and religious discrimination allegations, a state defamation, and a claim of age and religious

discrimination and retaliation under the Washington Law Against Discrimination ("WLAD"), chapter 49.60 Revised Code of Washington ("RCW"). ECF No. 60.

### *Time Sheets Investigation*

At the end of March 2018, PUD's counsel was interviewing PUD employees in the context of the present litigation. ECF No. 95-8 at 22. Two linemen, Bingham and Schwint, recounted that Black had falsified his time sheets in approximately 2014 and had directed them to falsify their time sheets to match. ECF No. 81 at 6. On approximately April 1, 2018, Stevens asked Tongue, who was by then Senior Manager of Construction and Maintenance for the PUD, to conduct the investigation with her assistance. ECF Nos. 67-6 at 10; 79 at 8; 81 at 6.

During the investigation, Tongue and Stevens interviewed seven linemen who had worked on Black's crew when Black served in the foreman role. ECF No. 79 at 8. Six of the linemen admitted that they had falsified their time sheets to some degree in 2014 at Black's direction. *Id.*; *see also* ECF No. 81 at 6−7. Tongue also reviewed time sheet records for Black and his crew members, as well as for four other foremen and their crews for comparison, and gate reader activity logs. ECF No. 81 at 7. Black disputes the integrity and efficacy of the methodology used in the PUD's time sheet investigation, particularly with respect to using gate reader activity logs, and has submitted expert opinion to support his contentions at summary judgment. ECF No. 95-2 at 4−5.

On May 29, 2018, Stevens sent Black a notice of a pre-disciplinary hearing in which she alerted Black of the tentative conclusions of the PUD's investigation into the 2014 time sheet misconduct and the potential that the PUD would discharge Black as a result. ECF No. 83-1 at 325−26. On June 6, 2018, Black responded in writing to the pre-disciplinary hearing notice rather than personally appearing at the hearing. ECF No. 83-1 at 328. He also objected to not receiving all of the documentation and evidence upon which the PUD relied in tentatively concluding that Black had engaged in time sheet misconduct. *Id.* Black denied all of the allegations contained in the pre-disciplinary hearing notice. *Id.* at 83-1 at 330. Stevens responded on behalf of the PUD in a letter dated June 7, 2018. ECF No. 83-1 at 332−33. Among other responses to Black's letter, Stevens indicated that the PUD would send the contents of Tongue's investigative file directly to Black and would consider any formal response that Black presented either orally or in writing by June 15, 2018. Black sent the PUD a timely written response. ECF No. 83-1 at 199, 337−39.

On June 20, 2018, the PUD terminated Black's employment in a letter from General Manager Kevin Nordt, indicating that the PUD had "considered . . . carefully" the information that Black had provided in his June 15, 2018 submission. ECF No. 83-1 at 341−42.

///

///

## JURISDICTION

This Court has federal question jurisdiction under 28 U.S.C. § 1331.  ECF No. 60 (Second Amended Complaint).  Black raises federal claims for age discrimination in violation of 29 U.S.C. § 623, the ADEA, and religious discrimination in violation of 42 U.S.C. §2000e-2(a), Title VII, as well as claims for employer retaliation for engaging in protected activity.  ECF No. 60.  Black's supplemental state claims for discrimination and retaliation, and defamation arise under the Washington Law Against Discrimination ("WLAD"), Revised Code of Washington ("RCW") chapter 49.50 and the common law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  If the moving party meets this challenge, the burden shifts to the nonmoving party to "set out specific

facts showing a genuine issue for trial." *Id.* at 324 (internal quotations omitted). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In deciding a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir. 1987).

## DISCUSSION

As a preliminary matter, the Court resolves the pending Motions to Strike.

### The PUD's Motion to Partially Strike the Expert Opinions Black Cites in Support of Summary Judgment

The PUD argues that Black's proffered expert, Randy Stedman, offers opinions that are unreliable and outside of Stedman's purported area of expertise. ECF No. 94 at 2.

Stedman was a Human Resources manager for the Chelan County PUD from 2004 until 2009. While in that position, he reviewed the results of an investigation into whether certain linemen accurately reported their time. For purposes of the Chelan County PUD timecards investigation, Stedman viewed gate access records as unreliable tools for testing the accuracy of the timecards. ECF No. 67-24 at 9. He determined that "sometimes people didn't swipe in[;] sometimes they didn't swipe out[;] sometimes the clocks didn't work[;] sometimes they came in a different way."

ECF No. 67-24 at 9.  Stedman could not recall whether the clocks in the Chelan County's gate access system were connected to a central computer.  *Id.* at 11.

The PUD argues that Stedman's past work at Chelan County PUD does not qualify him as a "gate access systems" expert.  ECF No. 94 at 8.  The PUD further maintains that Stedman lacks qualifications to opine regarding the PUD's gate access records because the PUD uses a central computer system, and Stedman acknowledged at deposition that he had no experience with such a system.  *Id.* at 8–9.  Lastly, the PUD argues that Stedman's opinions are not relevant to the issues in the case and are therefore not helpful to the trier of fact.  *Id.* at 9.

The PUD does not show that Stedman lacked the qualifications to render the opinions that he rendered or that his opinions were based on an unreliable methodology.  *See* Fed. R. Evid. 702.  Stedman did not purport to be an expert on either Chelan County PUD's gate access system or the PUD's gate access system.  Rather, his expertise is premised on his lengthy experience as a human resource professional and in having conducted a time sheet investigation at a different PUD.  ECF Nos. 88-1 (Stedman's report and résumé); 88-2 (supplemental report).  The issues raised by the PUD go to the weight of the evidence and not admissibility, as the PUD may highlight any differences between the variables described by Stedman regarding the Chelan County PUD and the variables at issue in the PUD's gate access system.  Therefore, the Court declines to strike the opinions from the summary judgment record.

**Black's Motion to Strike Declarations of Michael Tongue**

Black seeks to exclude the declarations of Tongue, ECF Nos. 79 and 93, on the basis that they are an "attempt to backdoor undisclosed and untimely expert opinion testimony to support [the PUD's] case." ECF No. 114 at 3. The PUD counters that it offers Tongue as "a fact witness to testify about, among other things, [Black's] misconduct, including Tongue's participation in investigations into that misconduct, which he conducted as a manager at the PUD." ECF No. 124 at 1.

The opinions to which Black objects are admissible as lay witness opinion testimony pursuant to Fed. R. Evid. 701, as they are based on Tongue's perception and are arguably helpful to understanding his testimony or determining a fact in issue. Therefore, the Motion to Strike Tongue's declarations is without merit and shall be denied.

**The PUD's Motion to Strike Black's Reply**

The PUD moves to strike allegedly new arguments and unsupported factual assertions in the reply brief that Black submitted in support of his Motion for Summary Judgment. ECF No. 116. Black responds that the arguments stated in the reply brief are responsive to the PUD's response brief and the new declarations that the PUD submitted with the brief. The PUD did not request an opportunity to file a sur-reply and was given an opportunity to address the contents of Black's reply at oral argument in this matter.

1   The PUD takes issue with the portions of Black's reply containing arguments

2   for the Court to infer retaliatory motive from the context in which the time sheets

3   investigation arose during this litigation.  *See* ECF No. 116 at 3−7.  Black's

4   assertions in his reply are an attempt to show that the PUD's explanation of the

5   investigation should not be believed.  *See* ECF Nos. 104 and 122.  Therefore, the

6   Court finds that Black's reply brief addressed arguments and evidence submitted by

7   the PUD in responding to Black's Motion for Summary Judgment.  *See ACLU of*

8   *Nev. v. City of Las Vegas*, 333 F.3d 1092, 1106, n. 14 (9th Cir. 2003) (denying

9   motion to partially strike a brief on appeal because "the 'new' arguments raised in

10  the . . . reply brief were a reasonable response to points made in the brief" to which

11  it was responding).  The PUD's Motion to Strike the reply shall be denied.

12                      **Cross-Motions for Summary Judgment**

13  Black seeks summary judgment solely on his retaliation claims.  ECF No. 66.

14  The PUD seeks summary judgment dismissal of all of Black's claims.  ECF No. 69.

15  Black's claims in his Second Amended Complaint include: age discrimination and

16  retaliation under the federal ADEA; religious discrimination and retaliation under

17  the federal Title VII; age discrimination, religious discrimination, and retaliation

18  under the state WLAD; and a state defamation claim.  ECF No. 60.

19  ///

20  ///

21  ///

ORDER DENYING MOTIONS TO STRIKE AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 17

*Defamation*

In responding to the PUD's Motion for Summary Judgment, Black consented to dismissal of his state defamation claim. ECF No. 96 at 19. Therefore, the Court grants the PUD summary judgment on that claim.

*Discrimination*

Black acknowledges that he relies on circumstantial rather than direct evidence to establish the requisite prima facie showings in this matter. *See* ECF Nos. 96 at 17; 104 at 6. All of the discrimination claims raised by Black, under state and federal law, utilize the burden shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802−05 (1973), when the plaintiff offers circumstantial evidence of discriminatory motive. For claims to survive summary judgment under that framework, a plaintiff must satisfy the initial burden of establishing a prima facie case of discrimination.

A plaintiff claiming age discrimination must show that he "(i) was a member of the protected class, (ii) was performing his job in a satisfactory manner, (iii) was discharged, and (iv) was replaced by a substantially younger employee with equal or inferior qualifications." *Palmer v. United States*, 794 F.2d 534, 537 (9th Cir. 1986).

A plaintiff alleging religious discrimination must satisfy the same prima facie elements for claims of discrimination on the basis of race under Title VII. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). An employee must allege that he: (1) is a member of a protected class; (2) performed his

job adequately; (3) suffered an adverse employment action, and (4) was treated differently than a similarly situated employee who was not a member of his protected class. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

WLAD claims require the same elements for a prima facie case of discrimination and adhere to the same burden-shifting framework at summary judgment. *See Scrivener v. Clark Coll.*, 181 Wn.2d 439, 445−49 (Wash. 2014).

The Ninth Circuit has stressed that the plaintiff's burden in establishing a prima facie case of discrimination is "minimal" and "does not even need to rise to the level of a preponderance of the evidence." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005) (internal quotation omitted).

If Black establishes a prima facie case for his claims, he activates a presumption that the PUD undertook the challenged employment actions because of Black's protected characteristics, age and religion. *Cornwell*, 439 F.3d at 1028. To rebut the presumption, the PUD must produce admissible evidence supporting that the PUD undertook the challenged employment actions for a "'legitimate, nondiscriminatory reason.'" *Id.* (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). If the PUD adequately demonstrates a legitimate, nondiscriminatory reason, the *McDonnell Douglas* presumption "drops out of the picture," and Black may defeat summary judgment only by demonstrating that, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that

the PUD undertook the challenged employment actions because of Black's age or religion.  *See id.*; *see also* Fed. R. Civ. P. 56(c).

"A plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action."  *Cornwell*, 439 F.3d at 1028, n. 6.  "Nor may a plaintiff create a genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted."  *Id.*  Rather, a plaintiff may raise a genuine issue of material fact as to pretext "via (1) direct evidence of the employer's discriminatory motive or (2) indirect evidence that undermines the credibility of the employer's articulated reasons."  *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170−71 (9th Cir. 2007).

Black alleges that the PUD discriminated against him on the basis of age and religion when it disciplined him following the tagging incident and the tool belt incident, promoted someone else to the supervising foreman position, and did not interview or hire Black for a lateral transfer position as Distribution Dispatch trainee.

While the showing that a plaintiff must make to state a prima facie case is minimal, Black seeks for the Court to re-evaluate the same personnel decisions made by the PUD, even to the extent of reviewing the same questionnaires submitted by the candidates for the supervising foreman position without the benefit of conducting the interviews, and infer a discriminatory motive.  That is not the Court's

role when Black has not met his initial burden. Black has neither offered evidence of satisfactory performance or different treatment of a similarly situated employee to invoke the presumption of discrimination, nor put forward specific and substantial evidence that the PUD's articulated reasons for their adverse actions are a pretext for unlawful discrimination. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Black's subjective belief that he was more qualified than the candidates that the PUD selected in the promotion and lateral transfer processes, or that he should not have been disciplined, is insufficient to meet the prima facie threshold or create a genuine issue of material fact. *See Cornwell*, 439 F.3d at 1028, n. 6.

Even if the Court were to find that Black had made a prima facie showing to invoke the presumption that the PUD's actions were discriminatory, the PUD put forth extensive evidence of a legitimate reason for each of the challenged actions. Black does not demonstrate that the PUD's proffered reasons for their actions were pretextual.

The PUD offered evidence that it disciplined Black following the July 2016 tagging incident for insubordination. *See, e.g.,* ECF No. 74. Black's assertions that he had good reasons for not following the instructions given to him do not raise a question of whether the PUD's motive for disciplining him was instead discriminatory. Indeed, the Court does not find any evidence in the record to undermine that Black was insubordinate with respect to the clearance tagging event.

The PUD offered specific evidence supporting its proffered explanation for the tool belt incident as well, and there is no countervailing evidence submitted that supports that the tool belt investigation and resulting discipline was motivated by age- or religion-based animus.

With respect to the two hiring processes, for the supervising foreman position and the Distribution Dispatch training role, the PUD offers the consistent and detailed recollections of the managers and fellow-union members involved in the decisions that explain why Black was not selected. The committee members for the supervising foreman position consistently recall that Black interviewed poorly for the position, and the committee was unanimous that Black should not be promoted. ECF Nos. 70 at 2; 76 at 9; 82 at 12. The PUD employee overseeing the lateral transfer process for the Distribution Dispatch role, Lopez, initially ranked Black at the same level as Kagele, who ultimately was selected for the role. ECF No. 75-1. Lopez was open to interviewing Black until he was told by Human Resources Manager Stevens to narrow the list of interviewees from thirteen to five. ECF No. 75 at 5. Lopez's primary objective was to select an individual with the appropriate demeanor for the role. *Id.* at 4−5. Lopez was convinced by an interaction he recalled with Black, and by information he received from Lopez's supervisor, not relating to Black's age or religion, that Black should not be in the group interviewed. *Id.* at 5.

1  Black counters with a conclusory assertion that he was more qualified than the

2  candidates selected, but he does not supply evidence that shows that the PUD's

3  stated reasons were a pretext for discrimination.  The Court's role is not to determine

4  whether a hiring committee's decision, given the candidates they were considering,

5  amounted to good judgment or commendable human resource management.  *See*

6  *Mesnick v. General Electric Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not

7  sit as super personnel departments, assessing the merits—or even the rationality—of

8  employers' nondiscriminatory business decisions.") (citing *Furnco Construction*

9  *Corps. v. Waters*, 438 U.S. 567, 578 (1978)).  Rather, the Court must determine

10  whether, by a preponderance of direct or circumstantial evidence, a plaintiff has

11  shown that an employer's decisions were discriminatory.  *Noyes*, 488 F.3d at

12  1170–71.  Viewing the evidence in the light most favorable to Black, the nonmoving

13  party, Black has not met his burden.  Therefore, the Court grants the PUD's Motion

14  for Summary Judgment as to Black's Title VII, ADEA, and WLAD discrimination

15  claims.

16  *Retaliation*

17  Both Black and the PUD move for summary judgment on the retaliation

18  claims; therefore, the Court addresses the question of summary judgment on these

19  claims from a perspective of viewing the facts in the light most favorable to each

20  party.  *See Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.

21  2001) (in resolving cross-motions for summary judgment, a district court must

consider each motion on its own merits and in accordance with Federal Rule Civil Procedure 56).

A prima face case of retaliation under Title VII and the ADEA requires that: (1) Black engaged in a protected activity; (2) the PUD subjected Black to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Nat'l Ass'n of African-American-Owned Media v. Charter Communs., Inc.*, 915 F.3d 617, 625 (9th Cir. 2019) (noting that the retaliation provisions of the ADEA and Title VII explicitly suggest "but-for causation"); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

The elements of a prima facie case for an WLAD retaliation claim also require that the employee: (1) took a statutorily protected action; (2) suffered an adverse employment action; and (3) a causal link between the employee's protected activity and the adverse employment action. *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411 (2018). For a plaintiff to avoid summary judgment on causation, he must show "*only* that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision." *Id.* at 412 (emphasis in original). The Washington Supreme Court, like the Ninth Circuit, has adopted the "knew or suspected" standard for evaluating whether summary judgment is appropriate on a retaliation claim, requiring sufficient evidence to reasonably infer "'both that [a supervisor] either knew or suspected' that an employee took a protected action 'and that there was a causal connection between this knowledge or suspicion and [the employee's]

termination.'" *Id.* at 417 (quoting *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1113, 1371 (9th Cir. 2003)).

A district court may infer from "'proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Ray*, 217 F.3d at 1244 (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1371 (9th Cir. 1987)); *see also Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008). Here, the PUD terminated Black nearly eight months after he filed his complaint, and the Court does not find the timing alone to constitute sufficient circumstantial evidence of retaliatory motive. Nevertheless, the Court acknowledges that the proximity in time combined with the order of events involved in the PUD investigating and terminating Black for timecard misconduct in spring and early summer 2018 may be sufficient to support a prima facie case. *See Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) ("Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the [sic] light of the timing and the surrounding circumstances.").

Once a defendant has explained its actions or produces evidence of legitimate nondiscriminatory reasons, the plaintiff must produce evidence that raises a genuine dispute of material fact as to whether the defendant's proffered reasons are pretextual. *See Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 693 (9th Cir. 2017). A plaintiff's retaliation claim ultimately may survive summary judgment only by setting forth "non-speculative evidence of specific facts, not sweeping

conclusory allegations." *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

The PUD proffered a coherent legitimate explanation for Black's discharge. Black emphasizes that Tongue had never performed a time sheet investigation before Black's, nor had Munro, the manager who "was responsible for this type of investigation" before Tongue also had not performed a timesheet investigation. ECF No. 67 at 2. However, the Court does not find that Tongue's inexperience with a timesheet investigation supports that the investigation or its consequences were retaliatory. Nor does the Court find the potential inference that timesheet investigations are rare at the PUD to be probative of a retaliatory motive. Black submitted a declaration in opposition to the PUD's summary judgment motion alleging a plethora of assumptions, oversights, and mistakes that the PUD made in its time sheet investigation before his termination. ECF No. 95-2. However, accepting as true Black's allegations that the time sheet investigation was flawed in its methodology, Black's evidence does not undermine whether the PUD's explanations for the discharge should be believed. Black alleges retaliation, not a due process violation. The Court does not find that any flaw alleged by Black with respect to the time sheet investigation raises a question of whether the investigation and Black's discharge were retaliation because of his litigation against the PUD.

Black also attempts to demonstrate retaliatory motive by showing that the PUD was aware of the time sheet allegations before Black pursued his

discrimination claims and did not investigate and act on the allegations until this litigation was underway. The fact that the time sheet allegations resurfaced, in greater detail, in the context of the PUD's preparing for this litigation does not amount to causation. Moreover, different supervisors may exercise discretion differently, and where different decisionmakers reach different conclusions an inference of discrimination or retaliation is rarely warranted. *See Radue v. Kimberly-Clark*, 219 F.3d 612, 618 (7th Cir. 2000) ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently.").

There are several distinctions between the 2014 or 2016 inquiry into timesheets and the 2018 investigation resulting in Black's termination that sufficiently account for the disparity in treatment and outcome of the two inquiries. There is no evidence that Heimbigner was told in either 2014 or 2016 that any time sheets actually were falsified or exaggerated. *See* ECF Nos. 79-2 at 20; 89 at 2; 96 at 2 (indicating that Bingham had told Heimbigner that Black had told linemen to report more time than they had worked, but noting indicating that the linemen actually did so). However, the evidence supports the PUD's characterization that in 2018 "[t]wo linemen told Stevens that Black regularly falsified his own time and

1  succeeded in getting them and others to do so over an extended period."  ECF No.

2  107 at 10 (emphasis removed).

3       The Court finds that Black has not supported a causal link between his

4  termination and his claims of discrimination.  Accordingly, Black's prima facie case

5  of retaliation fails.  Moreover, viewing the evidence in the light most favorable to

6  Black, he has failed to "demonstrate[] such weaknesses, implausibilities,

7  inconsistencies, incoherencies, or contradictions in [defendant's] proffered

8  legitimate reasons for its action that a reasonable factfinder could find them

9  unworthy of credence." *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d

10  1519, 1428 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998).   Therefore, even if

11  Black had supported a prima facie case, he has not demonstrated that the PUD's

12  proffered explanation is pretext or otherwise supports an inference of pretext.

13  Accordingly, the Court grants summary judgment to the PUD on Black's state and

14  federal retaliation claims.

## CONCLUSION

16       With Black's acknowledgement and consent, his state defamation claim shall

17  be dismissed.  With respect to Black's discrimination claims under federal and state

18  law, the PUD established that there are no disputed issues of material fact and as a

19  matter of law the claims are not supported and should be dismissed.  The PUD also

20  has established that there is no disputed issue of material fact and that as a matter of

21  law Black cannot prevail on his federal and state retaliation claims.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion to Strike Plaintiff's Statement of Facts, **ECF No. 94**, is **DENIED**.

2. Plaintiff's Motion to Strike Declarations of Michael Tongue, **ECF No. 114**, is **DENIED**.

3. Defendant's Motion to Strike Portions of Plaintiff's Reply in Support of Motion for Summary Judgment, **ECF No. 116**, is **DENIED**.

4. Plaintiff's Motion for Summary Judgment, **ECF No. 66**, is **DENIED**.

5. Defendant's Motion for Summary Judgment, **ECF No. 69**, is **GRANTED**.

6. Judgment shall be entered for Defendant.

7. All upcoming hearings and deadlines in this matter are **vacated**, and all pending motions are **denied as moot**.

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order, provide copies to counsel, enter judgment as directed, and **close the file**.

**DATED** June 26, 2019.

_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
United States District Judge